USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/30/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WELLS FARGO BANK, N.A.,

                Plaintiff,

       -v-

BIVONA & COHEN, P.C., and
JOHN BIVONA a/k/a JOHN V. BIVONA,

            Defendants.

---

No. 12-CV-5212 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Wells Fargo Bank, N.A. brings this diversity action against Defendant Bivona &
Cohen P.C., as borrower, for breach of its loan obligations under two promissory notes, and against
Defendant John Bivona, as guarantor, for breach of guaranty in connection with those loans.

Before the Court is Plaintiff's motion for summary judgment against Defendant Bivona,
pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for dismissal of Bivona's
counterclaims pursuant to Rule 12(c).[1]  For the reasons that follow, Plaintiff's motion is
GRANTED.

## BACKGROUND

### A.    Facts[2]

Until 2009, Bivona was an equity shareholder in Bivona & Cohen, a boutique law firm
specializing in insurance defense. He served as its managing partner from 1996 to 2009. Bivona

---

[1] Bivona & Cohen has not answered the Complaint or otherwise appeared in the case.

[2] The facts set forth herein are taken from the parties Local Civil Rule 56.1 statements and accompanying
affidavits and exhibits.

Aff. ¶ 2 (Dkt. 73).  In June 2009, Bivona entered into a Separation, Release and Indemnification Agreement ("Separation Agreement") with the firm and Marlene Monteleone, the firm's new managing partner.  Id. ¶¶ 4, 6, Ex. A.  Under the terms of that agreement, Bivona relinquished his equity interests in the firm and agreed to become a non-equity "Income Partner" or "Of Counsel." Bivona Aff. Ex. A at 7.  The agreement also provided for Bivona to receive semi-monthly payments from the firm to repay an outstanding loan, a salary, referral fees for new clients, a car allowance, and a parking space in the firm parking lot.  Id. at 2–3.  Bivona further agreed that he would remain an unconditional guarantor of a loan and credit line with Wachovia Bank, N.A., with a maximum exposure of $2,000,000, "and all renewals or replacements thereof" until the conclusion of all payments owed to him by the firm.  Id. at 8.  The Separation Agreement also contained an indemnity provision, pursuant to which Bivona agreed to indemnify the firm and Monteleone in certain circumstances, and to obtain a minimum $5,000,000 insurance policy naming the firm and Monteleone as insureds.  Id. at 5–6.

Wells Fargo's predecessors (including Wachovia), provided credit to Bivona & Cohen beginning in the 1990's.  Ottman Decl. ¶¶ 2, 34 (Dkt. 71).  In 2008, the firm's revenues began declining, reducing from $14 million in 2007 to $9 million in 2010.  Strauss Aff. Ex. B at 2 (Dkt. 79).  In 2010, Wells Fargo renewed and restructured Bivona & Cohen's credit facilities.  Id.  On December 14, 2010, Wells Fargo extended new loans to Bivona & Cohen pursuant to a loan agreement and two promissory notes ("Note 1" and "Note 2") in the amounts of $1,350,000 and $550,000, respectively.  Ottman Decl. Exs. A–C.  As discussed further below, the loans were guaranteed by both Monteleone and Bivona (the "Guarantors").  Ottman Decl. ¶¶ 15–22, Ex. D, Ex. E.

Wells Fargo began monitoring Bivona & Cohen's deteriorating financial situation in 2011. Strauss Aff. Ex. E (Dkt. 74). In October 2011, Bivona & Cohen provided Wells Fargo with a year-end financial projection which described the steps it was taking to reduce costs, such as layoffs and salary reductions. *Id.* Ex. F.

Wells Fargo continued to monitor Bivona & Cohen's financial condition and on November 14, 2011, produced an internal Problem Asset Report. Strauss Aff. Ex. B. The report noted that the value of the firm's discounted assets had decreased to half of their 2010 value, and that the firm's revenues were expected to drop more than 30 percent. *Id.* at 2. Bivona & Cohen's risk rating was downgraded, and the report recommended that a temporary extension of the facilities, which were due to expire on December 1, 2011, be granted in conjunction with a forbearance agreement. *Id.* at 6. Wells Fargo also initiated internal discussions regarding the steps required to minimize its potential losses. *Id.* Ex. K, Tr. 14–16. After meeting with Monteleone on December 8, 2011, Wells Fargo updated its assessment of Bivona & Cohen in the Problem Asset Report to note that the firm had collected less than expected from its outstanding accounts receivable, had reduced its revenue projections, and that there was now a "distinct possibility" that Bivona & Cohen would not be able to repay its obligations. *Id.* Ex. B at 7–8. The matter was then transferred to Wells Fargo's Credit Resolution Team, *id.* Ex. K, Tr. 31–32, which had experience working with higher risk credits, *id.* Ex. L, Tr. 9–10.

On January 24, 2012, Wells Fargo sent a letter to Bivona & Cohen, marked for the attention of Monteleone and copied to Bivona and Monteleone as guarantors, requesting a meeting to discuss the loan facilities, and asking that the firm sign a pre-negotiation agreement with Wells Fargo prior to the meeting. Strauss Aff. Ex. J. The pre-negotiation agreement—which set out the terms on which Wells Fargo was prepared to hold discussions—was signed by Monteleone on

behalf of Bivona & Cohen, and by Monteleone and Bivona as guarantors, and sent to Wells Fargo's counsel on January 27, 2012. *See id.* Exs. O, P.

In February 2012, Bivona & Cohen provided estimates of the current value of its assets to Wells Fargo. An initial estimate of Wells Fargo's recovery on the outstanding accounts receivable and work in progress of the firm was between $825,000 and $1.2 million, of which 75 to 80 percent could potentially be collected. Mark Santiago, a consultant for Bivona & Cohen, communicated the estimate during a February 8, 2012 call to Wells Fargo and it was memorialized in an email sent the same day by a Wells Fargo representative. Strauss Aff. Ex. L, Tr. 35–38; Ex. N.[3] Bivona & Cohen's attorneys provided a second estimate to Wells Fargo in a February 21, 2012 report, estimating the liquidated market value of the firm's accounts receivable and work in progress as $700,000. *Id.* Ex. Q. This report was discussed at a meeting that month between Wells Fargo and the firm regarding Monteleone's plan for the firm. *Id.* Ex. L, Tr. 39. Following the meeting, Sara Ottman, the firm's point of contact with the Credit Resolution Team at Wells Fargo, concluded that the bank likely did "not have enough collateral to cover [the firm's debt] in a liquidation scenario." *Id.* Tr. 54.

On February 27, 2012, Wells Fargo sent Bivona & Cohen a notice of default, which demanded repayment of the loans in full. Ottman Decl. Ex. H. The notice, which was copied to both guarantors, stated that Wells Fargo had directed its counsel to take "all legal steps necessary" to protect its rights, including potentially commencing legal action against Bivona & Cohen and the Guarantors. *Id.*

---

[3] In an email to other Wells Fargo staff, Nathan Hale, a member of the Legal Specialty Group, wrote: "Mark Santiago called this morning . . . Santiago has gone over the A/R's and WIP. He believes there is $1.1MM to $1.5 mm of viable inventory. He feels 75 to 80% could be realized." Strauss Aff. Ex. N. Other than this email, the record contains limited information about Santiago and his role in these discussions.

4

Around the same time, Monteleone began to negotiate with Wells Fargo in order to secure a forbearance agreement. Strauss Aff. Ex. W. The agreement was negotiated between attorneys for Bivona & Cohen and Monteleone, and attorneys for Wells Fargo. *Id.* Finalized on April 2, 2012, the agreement provided that Wells Fargo would release Monteleone from her obligations as guarantor if she collected $700,000 from Bivona & Cohen's accounts receivable, or otherwise paid that amount to Wells Fargo. *Id.* Ex. X at 2–3. Wells Fargo asserts that it made the agreement with Monteleone because of her ongoing role at Bivona & Cohen, her ongoing collection of receivables for the firm, and her dialogue with the bank. *See* Strauss Aff. Ex. R, Tr. 44–45. By contrast, Wells Fargo posits that Bivona's lack of involvement in the firm and failure to respond to the notice of default led the bank to decide not to enter into a similar agreement with Bivona. *See id.* Tr. 60–61

Consistent with her forbearance agreement, once Monteleone delivered in excess of $700,000 from the accounts receivable to Wells Fargo, she was released as a guarantor from the debt. *Id.* Tr. 67. There is no evidence that Wells Fargo attempted to collect any of the remaining accounts receivable. *Id.* at Tr. 76; Def's Opp. at 13. Wells Fargo asserts that these remaining receivables were "significantly uncollectible." *Id.* Ex. R, Tr. 77.

As of January 23, 2015, Wells Fargo asserts that, subtracting the amounts already paid by the firm through the collection of accounts receivable from the firm's outstanding balance, a total of $644,457.56 in principal plus $54,823.52 in interest on Note 1 and $450,000 in principal and $53,184.47 in interest on Note 2, as well as costs and expenses, were owed by Defendants. Pl.'s Mem. at 4–5 (Dkt. 72) (citing Ottman Decl. 28–31).

**B.    Procedural History**

Wells Fargo commenced this action on July 5, 2012, claiming that Bivona & Cohen was indebted to Wells Fargo for the aggregate principal amount of $1,119,740.36, plus accrued interest,

5

late charges, and collection expenses.  Compl. ¶¶ 38–39 (Dkt. 1).  Wells Fargo also claims a breach

of guarantee by Bivona for damages in the same amount.  *Id.* at ¶ 41.  Bivona & Cohen did not

respond to the Complaint.  Schwed Decl. ¶ 3 (Dkt. 70).  Bivona filed an Answer on September 7,

2012.  *Id.*

Wells Fargo first moved for summary judgment on April 19, 2013, more than four months

before the parties' agreed-upon discovery deadline, and before any of the interim deadlines for

interrogatories, depositions or expert disclosures had elapsed.  Schwed Decl. ¶ 4; Ex. 2, Tr. 3.  The

Court denied Wells Fargo's motion as premature and granted Bivona's cross-motion for leave to

file an amended answer, which he did on February 3, 2014.  *Id.* at ¶¶ 5, 8.  As described below,

the Amended Answer includes fourteen affirmative defenses, cross-claims against Bivona &

Cohen, and six counterclaims against Wells Fargo.  Am. Answer ¶¶ 43–82 (Dkt. 51).  After

discovery concluded, Wells Fargo renewed its motion for summary judgment on February 13,

2015.  Pl.'s Mot. (Dkt. 68).

## LEGAL STANDARD

Summary judgment is only appropriate where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." *Tolbert v. Smith*, 790 F.3d

427, 434 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).  In making such determination, the Court

must "resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d

Cir. 2015) (quoting *Lederman v. NYC Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir.

2013)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986) (quotations omitted).

In addition to its motion for summary judgment, Wells Fargo also seeks dismissal of Bivona's counterclaims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The evidence set forth by the parties is relevant to both the counterclaims and Bivona's affirmative defenses, as there is a considerable overlap between the two. Because the parties have had a reasonable opportunity to present all pertinent factual material, the Court has considered the counterclaims according to the summary judgment standard. *See* Fed. R. Civ. P. 12(d).

## DISCUSSION

To be granted summary judgment on its claims against Bivona as well as Bivona's counterclaims, Wells Fargo must establish beyond genuine dispute the validity of the debt owed and its guarantees, and that the affirmative defenses and counterclaims asserted by Bivona are without merit. For the reasons set forth below, Wells Fargo has met its burden.

## I.  Validity of the Guarantees

Under New York law,[4] "an obligee 'seeking to enforce a written unconditional guarantee satisfies its *prima facie* case by establishing: (1) an absolute and unconditional guarantee; (2) the underlying debt; and (3) the guarantor's failure to satisfy the unpaid debt.'" *Aersale Inc. v. Ibrahim,* No. 13-CV-713 (KBF), 2013 WL 5366384, at *3 (S.D.N.Y. Sept. 25, 2013) (quoting *Citicorp Leasing Inc. v. United Am. Funding, Inc.*, No. 03-CV-1586 (WHP), 2005 WL 1847300, at *4 (S.D.N.Y. Aug. 5, 2005)). *See also Hotel 71 Mess Lender LLC v. Mitchell,* 880 N.Y.S.2d 67, 68 (App. Div. 1st Dep't 2009). "An action to enforce a guarantee—typically based on unambiguous contract language—is particularly amenable to resolution on summary judgment." *Aersale Inc.*, 2013 WL 5366384, at *4.

---

[4] There is no dispute as to the applicable law.  The guarantees at issue provide "[t]his guaranty shall be governed by and interpreted in accordance with federal law and, except as preempted by federal law, the laws of [New York] without regard to that state's conflict of law principles."  Ottman Decl. Exs. D, E.

7

Wells Fargo has established these elements by setting forth evidence of (1) the promissory notes and guarantees between the parties, (2) Bivona & Cohen's failure to make payment following its default, and (3) Bivona's failure to satisfy his obligations under the guarantees. *See* Pl.'s Mem. at 5–6. The debt underlying the guarantees is evidenced by the promissory notes signed by Bivona & Cohen, establishing its debt to Wells Fargo for the amounts of $1,350,000 and $550,000, as well as the corresponding loan agreement between the parties. Ottman Decl. ¶¶ 5–10, Ex. A–C. Pursuant to those guarantees, Bivona "absolutely, irrevocably, and unconditionally guarantee[d] to [Wells Fargo] the timely payment and performance of all liabilities and obligations of [Bivona & Cohen] to [Wells Fargo] under [the promissory notes]." Ottman Decl. Exs. D, E. Bivona has not satisfied the unpaid debt as guarantor, although he disputes whether he is obligated to do so. Ottman Decl. ¶ 4.

Bivona does not identify any facts which would controvert Wells Fargo's assertions regarding the above elements, or otherwise raise a triable issue of fact in response. Although at an earlier point in these proceedings, Bivona challenged the validity of his signature on one of the guarantees, Bivona Aff. ¶ 7, and raised a defense of forgery, Am. Answer ¶ 51, he has since abandoned this defense, Schwed Decl. ¶¶ 16–18, 18, Ex. 8.[5] Wells Fargo has therefore made out its *prima facie* case as to both guarantees.

---

[5] Bivona's briefing on the present motion reasserts that he did not sign the guaranty relating to Note 2, but concedes that he abandoned a forgery defense. *See* Def.'s Opp. at 5 n.1 (Dkt. 75).

## II.     Waiver of Defenses

Bivona concedes that Wells Fargo is entitled to summary judgment on his seventh and eighth affirmative defenses (that one of the guarantees is a forgery, and that Wells Fargo's claim that Bivona entered into one or more of the guarantees is without merit). Def's Opp. at 15 n.3 (Dkt. 75).

Bivona's twelve remaining affirmative defenses against Wells Fargo, some of which overlap, assert in substance that the guarantees were fraudulently induced, signed in duress, and are unconscionable; that the obligation has been satisfied; that Wells Fargo's acceptance of payments from Bivona & Cohen interfered with and disturbed agreements in place between Bivona & Cohen and Bivona; that Wells Fargo's failure to exercise its rights over the firm's collateral led to the collateral's destruction; that Wells Fargo wrongfully failed to place the promissory notes in default upon learning that Bivona was no longer a shareholder; that by conspiring to shut down Bivona & Cohen, Wells Fargo maliciously interfered with Bivona's Separation Agreement and with his entitlement to indemnity by the firm; that Wells Fargo interfered with Bivona's subrogation rights by conspiring to shut down Bivona & Cohen and impairing its assets; and that Wells Fargo failed to dispose of the firm's collateral in a commercially reasonable manner and conspired with Bivona & Cohen in doing so, destroying and impairing the assets and breaching the covenant of good faith and fair dealing in the guarantees. Am. Answer ¶¶ 43–58.[6]

Bivona also asserts six counterclaims: that Bivona was damaged by Wells Fargo's acceptance of payments from Bivona & Cohen which interfered with and disturbed agreements between Bivona and the firm; that any damages owed are offset by payments from Bivona &

---

[6] As noted above, Bivona's seventh and eighth affirmative defenses regarding his signing of the guarantees are withdrawn.

9

Cohen and payments due to Bivona; that Bivona was damaged by Wells Fargo's tortious interference with his Separation Agreement; that Wells Fargo induced, aided, and abetted in Monteleone's breach of the fiduciary duty she owed to Bivona & Cohen; that Wells Fargo breached the covenant of good faith and fair dealing by conspiring with Monteleone to dispose of Bivona & Cohen's assets in a commercially unreasonable manner; and that Wells Fargo impaired Defendant's subrogation rights by conspiring with Monteleone to dispose of Bivona & Cohen's assets in a commercially unreasonable manner. *Id.* at ¶¶ 64–82.

Wells Fargo argues that the express terms of each of the guarantees preclude Bivona from asserting any affirmative defenses or counterclaims. Pl.'s Mem. at 6. Indeed, under New York law, courts enforce broad waivers of defenses contained in guarantees. *See, e.g., JPMorgan Chase Bank, N.A. v. Reifler*, __ F. App'x __, 2015 WL 3556070, at *1 (2d Cir. June 9, 2015) ("[A]bsolute and unconditional guaranties have been found to preclude guarantors from asserting a broad range of defenses under New York law, including fraud in the inducement."). The guarantees at issue here expressly provide that they are "continual and unconditional guarant[ees] of payment and performance" under which Bivona "waives and releases [specified] rights, demands and defenses" set forth in the waiver clauses. Ottman Decl. Exs. D, E. Bivona disputes neither the existence nor validity of the waivers, but asserts that the scope of the waivers is limited such that certain of his defenses and counterclaims should survive Plaintiff's motion.

While the waivers contained in the guarantees are indisputably broad, they are not so broad as to prevent Bivona from raising any affirmative defenses or counterclaims—despite Wells Fargo's contention to the contrary. *See* Pl.'s Mem. at 6 (citing Ottman Decl. Ex. D, E).[7]

---

[7] The full text of the sub-clauses cited by Wells Fargo provides that Bivona waived:

(g) the right to assert against [Wells Fargo] or its affiliates any defense (legal or equitable), set-off, counterclaim, or claim that [Bivona] may have at any time against [Bivona & Cohen] or any other

10

Considered in their entirety, the waiver clauses define both those defenses against Wells Fargo that are waived—including those claims Bivona may have against the firm and those relating to the enforceability and validity of the guarantees—as well those defenses not waived, including, as relevant here, the commercial reasonableness of the disposition of the firm's collateral. Ottman Decl. Exs. D, E.[8]

Accordingly, in its analysis of the twelve remaining affirmative defenses raised by Bivona, the Court will first examine whether the defenses are precluded by the waivers in the guarantees, or whether they are capable of survival, before assessing Wells Fargo's specific arguments as to whether a genuine dispute of material fact remains. The Court notes at the outset that while Bivona continues to assert all of the defenses, *see* Def.'s Opp. at 15, his opposition brief chiefly addresses his fourteenth affirmative defense (and fifth counterclaim) of commercial reasonableness, *id.* at 16–24.

## III.    Bivona's Affirmative Defenses and Counterclaims

### A.  Fraudulent Inducement

In his first affirmative defense, Bivona asserts that the guarantees were fraudulently induced. Am. Answer ¶ 43.  The waivers in both guarantees, however, prevent Bivona from raising

---

party liable to [Wells Fargo] or its affiliates; (h) all defenses relating to invalidity, insufficiency, unenforceability, enforcement, release or impairment of [Wells Fargo] or its affiliates' lien on any collateral, of the Loan Documents, or of any other guarant[e]es held by [Wells Fargo].

Ottman Decl. Exs. D, E.  The Guarantees also provide, however, that a defense regarding Wells Fargo's "obligation to dispose of Collateral in a commercially reasonable manner is not waived hereby." *Id.*

[8] The cases cited by Wells Fargo in its motion papers are largely inapposite because they concern broader waiver clauses.  In *Fortress Credit Corp. v. Hudson Yards, LLC*, for example, the court noted that the defendant had waived "all defenses and counterclaims except actual payment and performance in full" in a guaranty.  912 N.Y.S.2d 41, 41–42 (App. Div. 1st Dep't 2010).  Similarly, in *Generale Bank v. Wassel*, the defendant, who had defaulted on a promissory note, waived all counterclaims and setoffs, as well as "any defenses, counterclaims or rights to setoff that the undersigned may have or hereafter acquire."  779 F. Supp. 310, 316–18 (S.D.N.Y. 1991).

11

defenses relating to the invalidity or unenforceability of the "Loan Documents" as defined therein. The defense of fraudulent inducement is precluded by such language. *See Citibank, N.A. v. Plapinger*, 485 N.E.2d 974 (N.Y. 1985) ("[f]raud in the inducement of a guarantee by corporate officers of the corporation's indebtedness is not a defense to an action on the guarantee when the guarantee recites that it is absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee); *Citicorp Leasing Inc.*, 2005 WL 1847300, at *5 (defense of fraudulent inducement precluded by an "absolute and unconditional" guarantee).

Although the "Loan Documents" referred to in the guarantees are not specified, there is no evidence to suggest that the documents do not include the guarantees themselves. Indeed, the guarantees define "Loan Documents" as "all documents executed in connection with or related to the Guaranteed Obligations."[9]  Ottman Decl. Exs. D, E.  Internal references in certain clauses of the guarantees further support this interpretation; for example, the Final Agreement sub-clause provides that "[t]his Agreement *and the other Loan Documents* represent the final agreement between the parties." *Id.* (emphasis added).  The Court therefore concludes that Bivona, by signing the guarantees, waived his right to assert fraudulent inducement of the guarantees as a defense.

Even if the guarantees did not prevent Bivona from asserting a defense of fraudulent inducement, however, the defense would nonetheless fail. To prevail on the defense, Bivona would need to demonstrate that "(1) [Wells Fargo] made a material false representation, (2) [Wells Fargo] intended to defraud [Bivona] thereby, (3) [Bivona] reasonably relied upon the representation, and (4) [he] suffered damage as a result of such reliance." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)) (stating elements under New York law).  Bivona has

---

[9] The "Guaranteed Obligations" are Bivona & Cohen's obligations to Wells Fargo under the Promissory Notes and Loan Documents. *See* Ottman Decl. Exs. D, E.

12

not produced or described any documents that would suggest that Wells Fargo made a material false representation, or that Bivona relied on such representation in signing the guarantee. Indeed, the only relevant facts asserted in Bivona's Rule 56.1 Counterstatement are that Monteleone made a statement to Bivona regarding the financial difficulties faced by Bivona & Cohen, and that Bivona decided to guarantee the loan extension because he "did not want to see B&C go out of business because of the impact that would have on its staff." Def.'s Counterstatement ¶ 3. Bivona's fraudulent inducement defense thus fails as a matter of law.

## B. Duress

Bivona's second affirmative defense of duress fails for similar reasons. First, Bivona is precluded by the waivers in the guarantees from raising the defense because it relates to the invalidity or unenforceability of the Loan Documents. *See Banco do Estado de Sao Paulo S.A. v. Mendes Junior Int'l Co.*, 672 N.Y.S.2d 28, 29 (App. Div. 1st Dep't 1998) (defense of duress barred by waiver of defenses relating to unenforceability).

Second, there is no evidence in the record to support a defense of duress. To prove economic duress, Bivona must establish that the guarantees were procured by "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." *Kramer v. Vendome Group LLC*, No. 11-CV-5245 (RJS), 2012 WL 4841310, at *6 (S.D.N.Y. Oct. 4, 2012) (citations omitted). Bivona has provided no evidence to support any of those elements. In fact, during his deposition, Bivona conceded, "I don't recall that I signed [the guarantees] under duress, I don't know." Schwed Decl. Ex. 9, Tr. 34. There is thus no issue for trial regarding Bivona's defense of duress.

13

### C. Unconscionability

Bivona's third affirmative defense of unconscionability similarly challenges the enforceability of the guarantees and thus cannot be maintained. In any event, the defense is without merit. Whether a contract is unconscionable is for the court to decide as a matter of law. *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 786 (2d Cir. 2003). "In general, an unconscionable contract is defined as one which is so grossly unreasonable as to be unenforc[ea]ble because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *King v. Fox*, 851 N.E.2d 1184, 1191 (N.Y. 2006) (citing *Gillman v. Chase Manhattan Bank*, 534 N.E.2d 824 (N.Y. 1988)). Courts should therefore consider the possibility of both substantive and procedural unconscionability. *See Dallas Aero., Inc.*, 352 F.3d at 787.

With regard to the substance of the guarantees, Bivona has not pointed to any particular clauses which he considers to be unreasonably favorable to Wells Fargo and the Court sees no basis to support a finding of substantive unconscionability.

In determining whether there has been any procedural unconscionability, the Court must consider "(1) the size and commercial setting of the transaction; (2) whether there was a 'lack of meaningful choice' by the party claiming unconscionability; (3) the 'experience and education of the party claiming unconscionability'; and (4) whether there was 'disparity in bargaining power.'" *Dallas Aero., Inc.* 352 F.3d at 787 (quoting *Gillman*, 534 N.E.2d at 828). Here, the guaranty represented an arms-length business transaction between sophisticated parties in the context of the restructuring and renewal of Bivona & Cohen's loan facilities with Wells Fargo. Bivona served as the managing partner of the insurance litigation firm for thirteen years, and was therefore familiar not only with complex legal issues, but with the nature of the firm's financing

14

arrangements. Furthermore, Bivona had previously acted as a guarantor of the firm's loans, and at the time he signed the guarantees at issue here, he was aware that the firm had been having financial difficulties. *See* Schwed Aff. Ex. 9, Tr. 41. Bivona would have thus been aware of the potential consequences of signing the guarantees.

These circumstances do not present a basis for finding procedural unconscionability, and that Bivona is now called upon to fulfill his obligations as a guarantor does not change that conclusion. "The bedrock of the doctrine of unconscionability is the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risk." *NML Capital v. Republic of Arg.*, 621 F.3d 230, 237–38 (2d Cir. 2010) (quoting *Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 623 N.E.2d 531, 535 (N.Y. 1993)). Because no such "oppression" or "unfair surprise" is present here, Bivona's defense of unconscionability fails.

### D. Satisfaction

In his fourth affirmative defense, Bivona asserts that to the extent he is liable for any debt owed by Bivona & Cohen, that obligation has been satisfied, in part or in full. Am. Answer ¶ 46. Because Wells Fargo is only seeking to recover the unpaid obligations plus its collection expenses, Pl.'s Mem. at 13, this defense has no bearing on his liability.

### E. Acceptance of Payments (Tortious Interference)

In his fifth affirmative defense, first counterclaim, and part of his third counterclaim,[10] Bivona argues that by accepting payments from Bivona & Cohen, Wells Fargo "interfered and disturbed agreements in place between [Bivona & Cohen] and Bivona." Am. Answer, ¶¶ 49, 64, 68, 70. Bivona specifically relies on his Separation Agreement, under which Bivona & Cohen was

---

[10] Bivona also asserts in his third counterclaim that Wells Fargo interfered with his indemnity rights. Am. Answer. ¶ 70. *See infra* p. 22.

to repay an outstanding loan, and pay him a salary and referral fees for new clients. Am. Answer ¶ 68; Bivona Aff. Ex. A.

Although the waivers in the guarantees do not specifically preclude a defense or counterclaim based on tortious interference, the subordination provision in the guarantees estops Bivona from asserting priority over any debts owed to him by the firm, even if Wells Fargo prevented the firm from making payments to him. Pursuant to that clause, Bivona agreed:

> (a) to subordinate the obligations now or hereafter owed by [Bivona & Cohen] to [Bivona] ("Subordinated Debt") to any and all obligations of [Bivona & Cohen] to [Wells Fargo] or its affiliates now or hereafter existing while this Guaranty is in effect, provided however that [Bivona] may receive regularly scheduled principal and interest payments on the Subordinated Debt so long as (i) all sums due and payable by [Bivona & Cohen] to [Wells Fargo] and its affiliates have been paid in full on or prior to such date . . .

Ottman Decl. Exs. D, E.

Bivona thereby agreed that the firm's repayment of its obligations to Wells Fargo would take priority over any amounts it owed to Bivona and he cannot maintain a defense (or counterclaim) based on the priority of Bivona & Cohen's obligations to Bivona over those it owed to Wells Fargo.

Even notwithstanding this provision, however, the defense fails. To succeed in a tortious interference with contract defense or counterclaim, Bivona must establish "the existence of a valid contract between [Bivona and the firm], [Wells Fargo's] knowledge of that contract, [Wells Fargo's] intentional procurement of the [firm's] breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 104 (2d Cir. 2012) (quoting *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1375 (N.Y. 1996)). Bivona has not produced any evidence that Wells Fargo was aware of the terms of his Separation Agreement with the firm. Rather, he

16

asserts that Wells Fargo possessed information that Bivona received monthly payments from Bivona & Cohen in the amount of $25,000, citing a personal financial statement dated September 10, 2010 in the bank's possession. Bivona Aff. ¶ 5, Ex. L (filed under seal). The statement, however, does not provide any details about the payment. *Id.* More significantly, even assuming Wells Fargo's knowledge of the payments, there is no evidence to suggest that Wells Fargo induced a breach of the Separation Agreement, or any other agreement between Bivona and the firm. In fact, Bivona & Cohen had already breached the Separation Agreement when it stopped making payments to Bivona in June 2010—prior to Wells Fargo calling in the firm's debt. *See* Schwed Decl. Ex. 9, Tr. 78. Bivona has therefore not raised a genuine issue of material fact for trial regarding the Separation Agreement.

In any event, in a tortious interference claim, the scope of what constitutes "improper interference" is "narrowed by the self-interest exception: as long as the means employed are not improper or malicious, one with a financial interest in the business that is subject to the contract is privileged to interfere with the contract in order to protect that self-interest." *Imtrac Indus., Inc. v. Glassexport Co.*, No. 90-CV-6058 (LBS), 1996 WL 39294, at *7 (S.D.N.Y. Feb. 1, 1996). (citing *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988)). Here, there is no evidence to suggest that Wells Fargo acted with any purpose other than protecting its own, contractual interests. Any purported interference would therefore be privileged rather than tortious, defeating the defense.

### F. Offset

As his sixth affirmative defense and second counterclaim, Bivona asserts that the obligation in the guarantee "is offset by any payments taken by [Wells Fargo] from [Bivona & Cohen] and for any payments otherwise due to Bivona or taken by [Wells Fargo]." Am. Answer ¶¶ 50, 66–

17

67.  There is no evidence, however, that Wells Fargo took any payments from Bivona & Cohen other than in respect to the outstanding debt on the promissory notes and, as noted above in connection with the fourth affirmative defense, Wells Fargo is only seeking to recover the unpaid obligations plus its collection expenses.  Pl.'s Mem. at 13.

Moreover, as to the payments purportedly owed to him, Bivona does not cite any such amounts other than those paid pursuant to his Separation Agreement.  As discussed with regard to the fifth affirmative defense, Wells Fargo's acceptance of payments from Bivona & Cohen— notwithstanding any amounts owed to Bivona by the firm—does not give rise to a valid defense or counterclaim.  Accordingly, Bivona's sixth affirmative defense and second counterclaim fail.

### G.  Failure to Exercise Rights over Collateral

As his ninth affirmative defense, Bivona asserts that Wells Fargo's "failure to exercise its rights over the collateral on the purported notes [led] to the destruction of the collateral, and damaged Defendant's subrogation rights thereby."  Am. Answer ¶ 53.  This defense also fails.

First, with regard to Wells Fargo's actions or lack thereof in relation to the firm's collateral, the waivers in the guarantees stated that Bivona had waived and released his rights, demands and defenses, including as to "promptness and diligence in collection of any of the Guaranteed Obligations from [Bivona & Cohen], and in foreclosure of any security interest and sale of any property serving as collateral for the Guaranteed Obligations."  Ottman Decl. Exs. D, E.  Therefore, Bivona cannot maintain a defense predicated on Wells Fargo's alleged inaction with regard to the collateral.

Second, as discussed above, Bivona agreed in the guarantees to subordinate any right he had to "contribution, reimbursement, indemnification, payment or the like" from the firm to Wells Fargo's rights "until such time as the Guaranteed Obligations have been fully satisfied."  *Id.*  Any

18

subrogation rights Bivona possessed were thus subordinated to Wells Fargo's rights until the debt was paid in full. Under New York law, parties are permitted to waive subrogation rights, and courts will enforce such waivers in the absence of overreaching or unconscionability. *See Potlatch Corp. v. Brown*, 97-CV-7088 (TPG), 1998 WL 544672, at \*2 (S.D.N.Y. Aug. 26, 1998) (awarding summary judgment to a lender against a guarantor who had waived the right of subrogation). *See also Bd. of Educ. v. Valden Assocs.,* 389 N.E.2d 798, 799 (N.Y. 1979); *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 317 F. Supp. 2d 336, 340 (S.D.N.Y. 2004), *aff'd as modified sub nom. St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply,* 409 F.3d 73 (2d Cir. 2005).

Insofar as Bivona argues that once he paid the guarantees and the debt was satisfied, he could have sought recovery from Bivona & Cohen, he is correct; the guarantees only precluded him from seeking contribution prior to the full satisfaction of the debt. *See* Ottman Decl. Exs. D, E; *see also Banco Nacional De Mex. V. Ecoban Fin. Ltd.*, 713 N.Y.S.2d 869 (App. Div. 1st Dep't 2000). Bivona further asserts, however, that Wells Fargo's release of Monteleone from the surety terminated his right to sue Monteleone on any claims Wells Fargo may have had against her prior to the release and was thus improper. *See* Def.'s Opp. at 25. This argument fails.

As a preliminary matter, the authority cited by Bivona for this point is inapposite; it relates to the discharge of a guarantor's obligation upon the release of the principal debtor or an extensive modification of the loan terms—not to the effect of the release of a co-guarantor. *See Jones v. Gelles*, 562 N.Y.S.2d 992, 993 (App. Div. 3d Dep't 1990) (holding that when a principal is released by a creditor, the surety is discharged as a matter of law because its right of subrogation is impaired); *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir. 1999) (under New York law, the "creditor's release of a principal debtor operates to discharge parties, such as guarantors, who are only secondarily

19

liable on a debt," but a guarantor may nonetheless waive defense of release in guaranty agreement); *United Natural Foods, Inc. v. Burgess*, 488 F. Supp. 2d 384, 394 (S.D.N.Y. 2007) (concluding that a modification of a guaranteed debt was so extensive, that it had the effect of discharging the guarantor unless the guarantor consented to the modification).

In any event, Bivona cannot maintain a defense based on Wells Fargo's release of Monteleone because he expressly waived the defense of release in the guarantees, which provided:

> [Bivona] consents and agrees that [Wells Fargo] . . . may from time to time, in its sole discretion, without impairing, lessening, or releasing the obligations of [Bivona] . . . "(e) proceed against, exchange, release, realize upon, or otherwise deal with in any manner any collateral that is or may be held by [Wells Fargo] in connection with the Guaranteed Obligations or any liabilities or obligations of Guarantor; and (f) proceed against, settle, release, or compromise with [Bivona & Cohen], any insurance carrier, or any other person or entity liable as to any part of the Guaranteed Obligations . . . all in such manner and upon such terms as [Wells Fargo] may deem appropriate, and without notice to or further consent from [Bivona]. No irregularity, discharge or unenforceability of, or action or omission by [Wells Fargo] relating to any part of the Guaranteed Obligations or any security therefor shall affect or impair this Guarant[ee].

Ottman Decl. Exs. D, E. Such waivers are enforceable under New York law. *See, e.g., Compagnie Financiere de CIC et de L'Union Europeenne*, 188 F.3d at 35 (collecting cases). Bivona's ninth affirmative defense thus fails.

### H. Default

Bivona next asserts in his tenth affirmative defense that he could have renegotiated the guarantees if Wells Fargo had placed the promissory notes in default when it learned that Bivona was no longer a shareholder of Bivona & Cohen. Am. Answer. ¶ 54. As an initial matter, Bivona ceased to be a shareholder in June 2009—a year and a half before entering into the guarantees at issue in December 2010. *See* Bivona Aff. Ex. A; Ottman Decl. ¶¶ 15–22. Bivona nonetheless contends that an October 2010 "Summary of Renewal Terms" proposal from Wells Fargo provided that it would be an event of default under the renewed loan arrangements between the firm and

20

Wells Fargo if either Monteleone or Bivona left the firm. Strauss Aff. Ex. C, at 2. There is no requirement in the summary, however, that Bivona remain a shareholder in the firm; in addition, the summary expressly provides that the terms of the parties' agreement are subject to further revision and that the proposal would not survive the closing of the loan agreement. *Id.* In fact, the final Loan Agreement refers only to the departure or death of Monteleone as an event of default. Ottman Decl. Ex. B, at 3.

Furthermore, any defense based on Wells Fargo's failure to declare a default is defeated by specific language in the waiver clauses of the guarantees, pursuant to which Bivona waived and released his rights, demands and defenses relating to both a change of ownership of Bivona & Cohen, and those based on a notice of default or any other notice to which Bivona may have been entitled. Ottman Decl. Exs. D, E. The defense thus fails.

## I. Malicious Interference Conspiracy

In his eleventh affirmative defense, Bivona asserts that Wells Fargo was or should have been aware of the agreement and "maliciously interfered in [his Separation Agreement] by conspiring to shut down" Bivona & Cohen. Am. Answer ¶ 55. As discussed above with regard to the fifth affirmative defense, a defense of tortious interference is not precluded by the waivers in the guarantees, but Bivona has not presented any evidence to establish a genuine issue for trial.

Bivona claims that Wells Fargo "conspired" to shut down Bivona & Cohen; however, "a claim for civil conspiracy is only tenable where there is evidence of an underlying actionable tort." *Pope v. Rice*, No. 04-CV-4171 (DLC), 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005) (quotations omitted). Bivona's failure to establish tortious interference therefore defeats his conspiracy defense.

21

Moreover, as Wells Fargo rightly points out, there is no evidence to support Bivona's allegations of conspiracy. In addition to the underlying tort, the four elements required to allege civil conspiracy are "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *Fertitta v. Knoedler Gallery, LLC*, 14-CV-2259 (JPO), 2015 WL 374968, at \*7 (S.D.N.Y. Jan. 29, 2015) (quoting *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 315 (S.D.N.Y. 2013)). Bivona has not set forth any evidence of a corrupt agreement between Wells Fargo and the firm and/or Monteleone to shut down Bivona & Cohen. Furthermore, Wells Fargo was entitled to hold Bivona to his contractual obligations; indeed, its right to do so is expressly reserved in the guarantees, pursuant to which, Bivona consented to a release by Wells Fargo of the firm and/or Monteleone. Ottman Decl. Exs. D, E.

### J.  Conspiracy to Interfere with Indemnity

As his twelfth affirmative defense and as part of his third counterclaim,[11] Bivona asserts that by "by conspiring to shut down Bivona & Cohen," Wells Fargo unlawfully interfered with his common law and contractual rights to indemnity from Bivona & Cohen. Am. Answer, ¶ 56. As discussed above, a valid defense of tortious interference requires the existence of a valid contract. *Valley Lane Indus. Co.*, 455 F. App'x at 104. Thus, any common law indemnity to which Bivona might be entitled is irrelevant to this defense. Bivona has not, moreover, established the existence of any contractual indemnity owed by Bivona & Cohen.

Bivona relies on a Shareholder Agreement he entered on April 16, 1996, when Monteleone and two other shareholders joined the firm. Am. Answer ¶ 69. Pursuant to Bivona's Separation

---

[11] Bivona's third counterclaim also asserts that Wells Fargo interfered with his "payment rights." Am. Answer ¶ 70. *See supra* p. 16.

Agreement, however, any rights he had under that 1996 agreement—including a guarantee against third party indebtedness—were terminated as of June 2, 2009. *See* Bivona Aff. Ex. A cl. 7. Significantly, the Separation Agreement does not include an indemnity of Bivona by the firm relating to his obligations as guarantor, although Bivona agreed to indemnify the firm as to certain other matters. *Id.* cl. 4.

There is thus no genuine dispute of fact regarding any indemnity owed to Bivona. Without any evidence of an underlying tort, Bivona's conspiracy defense fails.

## K. Subrogation Rights Conspiracy

Bivona's thirteenth affirmative defense and sixth counterclaim is that Wells Fargo "interfered in [his] subrogation rights by conspiring to shut down [Bivona & Cohen] and impairing its assets." Am. Answer, ¶¶ 57, 82 (Dkt. 51). This defense, like the other conspiracy-based defenses, fails. Again, Bivona cannot maintain an assertion of tortious interference without establishing the existence of a valid contract between himself and Bivona & Cohen with which Wells Fargo interfered. He has failed to do so.

## L. Commercial Reasonableness

As his fourteenth affirmative defense, Bivona asserts that Wells Fargo failed to dispose of the collateral for the loans in a commercially reasonable manner, and that it conspired with Monteleone in doing so. Am. Answer ¶ 58; Def.'s Opp. 16. In his fifth counterclaim, Bivona similarly asserts that Wells Fargo and Monteleone disposed of the firm's assets in a commercially unreasonable manner, impairing the value of the collateral, acting in a manner inconsistent with the intent of the parties, and breaching the covenant of good faith and fair dealing. *Id.* ¶¶ 78–79.

This defense is expressly preserved by the waiver clauses in the guarantees. *See* Ottman Decl. Exs. D, E (providing that Bivona waived and released his rights, demands and defenses "that

23

[Wells Fargo] or its affiliates preserve, insure or perfect any security interest in collateral or sell or dispose of collateral in a particular manner or at a particular time, provided that [Wells Fargo's] obligation to dispose of Collateral in a commercially reasonable manner is not waived hereby").[12] *See also* N.Y. U.C.C. § 9-610. In the accounts receivables context, however, the commercial reasonableness standard is applicable only where the creditor has possession and control over the accounts receivable—in other words, where the creditor has taken "action that removes the debtor's ability or wherewithal to make its own collection efforts." *F.D.I.C. v. Wrapwell Corp.*, No. 93-CV-859 (CSH), 2002 WL 14365, at \*3 (S.D.N.Y. Jan. 3, 2002). At summary judgment, the "decisive question" is therefore "whether a genuine issue of fact exists from which a reasonable jury could infer that [Wells Fargo] had possession and control over [Bivona & Cohen's] receivables or that [Bivona & Cohen] justifiably relied on [Wells Fargo's] collection efforts." *Id.* at 5.

Bivona asserts that there is sufficient evidence to create an issue of fact as to whether Wells Fargo controlled the firm's accounts receivable. Def.'s Opp. at 16. The Court disagrees. It is clear from the record that Wells Fargo did not have "possession and control," or even play an active role in the firm's efforts to collect outstanding accounts. Rather, the firm—through Monteleone's efforts—maintained control of the collection process. Wells Fargo did not supervise Monteleone's contacts with clients or otherwise interfere in the firm's efforts. *See* Strauss Aff. Ex. L, Tr. 78. To receive payments, Wells Fargo's representative would meet with Monteleone at a post office to collect any checks sent to the firm. *Id.* at 78-80; Ex. R, Tr. 47–48 ("[A]ll checks received by Bivona & Cohen were received in a post office box and that box was opened by Ms. Monteleone in the company of an employee of [Wells Fargo's law firm]. Checks were opened

---

[12] Bivona asserts that a purported waiver of the right to commercially reasonable disposition of collateral is invalid under New York law—a point which is not disputed by Wells Fargo.

and taken by the employee of [Wells Fargo's law firm who] would provide copies of those checks to Monteleone."). Wells Fargo did not make any additional collection efforts itself at any point. *See* Strauss Ex. L, Tr. 76–78. In sum, Wells Fargo fully preserved the firm's "ability or wherewithal" to pursue the collection itself. *See Wrapwell Corp.*, 2002 WL 14365, at *3.

The record further establishes that Wells Fargo's reliance on Monteleone's collection efforts was reasonable. During the deposition of Wells Fargo's credit resolution team employee Sara Ottman, she explained that the factors considered by Wells Fargo in deciding to rely on Monteleone to make collections included the fact that in Wells Fargo's experience, allowing the leadership of a firm to collect receivables had a much higher collection rate than having a third party undertake collection activity. Strauss Aff. Ex. L, Tr. 44. In addition, although Ottman stated that this was the only case where she had an out-of-business borrower collecting the collateral itself, the bank took into account that Monteleone "was cooperative and seemed engaged and motivated to make those collections." *Id.* at 21, 44.

That the amount eventually collected by the firm—$711,751.02—was consistent with the amount specified in Monteleone's forbearance agreement does not affect the Court's conclusion that the firm maintained control of the collection.[13] Indeed, Monteleone signed the forbearance agreement with Wells Fargo both in her capacity as sole shareholder of Bivona & Cohen, and in her individual capacity as guarantor, agreeing to "actively and aggressively collect the [accounts receivable] on behalf of [Bivona & Cohen]." Strauss Aff. Ex. X. Although Monteleone was discharged of her duty as a guarantor once $700,000 was collected, there is no evidence in the record to suggest that her efforts were separate from or inconsistent with the interests of the firm

---

[13] As discussed above, pursuant to the forbearance agreement between Wells Fargo and Monteleone, Monteleone was released from her obligations as guarantor once Wells Fargo had received $700,000 "collected from the [accounts receivable] by Guarantor or paid by Guarantor." *See* Strauss Aff. Ex. X.

25

at any point. Significantly, there is also no evidence that the firm's collection efforts were limited to the amount actually collected, or that it was prevented by Wells Fargo or Monteleone from making additional efforts.[14]   At no time—either before or after Monteleone's satisfaction of the forbearance agreement—did Wells Fargo assume responsibility for collections. Because there is no genuine dispute as to whether the accounts receivable were within Wells Fargo's control, no obligation of commercial reasonableness arose. *See Wrapwell Corp.*, 2002 WL 14365, at \*9.

Even assuming *arguendo* that Wells Fargo was exercising control over the accounts receivable, the next question is whether the method of disposition was commercially reasonable. The requirement of commercial reasonableness as to secured transactions under the Uniform Commercial Code applies to every aspect of the disposition, including the method, manner, time, place and terms. N.Y. U.C.C. § 9-610; *Marine Midland Bank v. CMR Indus., Inc.*, 559 N.Y.S.2d 892, 898 (App. Div. 2d Dep't 1990). It is Wells Fargo's burden to establish commercial reasonableness. *Wrapwell Corp.*, 2002 WL 14365, at \*10 (citing *Gen. Elec. Credit Corp. v. Durante Bros. & Sons, Inc.*, 433 N.Y.S.2d 574, 576 (App. Div. 1st Dep't 1980)). "If the creditor offers evidence to establish this, the debtor must then offer evidence demonstrating that an issue of fact remains." *Id.* (citing *Chem. Bank v. Haseotes*, No. 93-CV-2846 (LMM), 1994 WL 30476 (S.D.N.Y. Feb. 1, 1994)).

For purposes of this determination, "the primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale." *In re Zsa Zsa Ltd.*, 352 F. Supp. 665, 671 (S.D.N.Y. 1972) (emphasis in original), *aff'd sub nom. Oliner v.*

---

[14] To the extent Bivona's commercial reasonableness defense may be construed as a claim that Wells Fargo controlled the firm's collection by preventing his involvement, this argument is meritless. Although Bivona asserts that he offered to help Monteleone with the collection and could have collected more of the accounts receivable himself, *see, e.g.,* Bivona Aff. ¶¶ 11–12; Schwed Decl. Ex. 9, Tr. 83, 89, he also concedes that he was never told he was prohibited from assisting in the collection, Schwed Decl. Ex. 9, Tr. 89. In fact, Bivona testified that he never discussed the firm's collection efforts with Monteleone and made no efforts to contact clients himself. *Id.* 83, 89–90.

26

*Slavik*, 475 F.2d 1393 (2d Cir. 1973), *and aff'd sub nom. In the Matter of Zsa Zsa, Ltd.*, 475 F.2d

1393 (2d Cir. 1973). As discussed above, Wells Fargo reasonably relied on Bivona & Cohen,

through Monteleone, to collect its own accounts receivable. After Monteleone successfully

collected over $700,000—and discharged her end of the forbearance agreement—Wells Fargo

elected not to pursue the remaining accounts receivable. Strauss Decl. Ex. L at 75–76. According

to Sarah Ottman, Wells Fargo determined that the remaining accounts were "uncollectible at that

point" because of the "nature of the accounts, and the aging, the oldness of them" as well as the

fact that Monteleone's efforts to collect them had been unsuccessful. *Id.* at 76.

  The record contains no evidence to belie these assertions. Bivona's contentions to the

contrary are merely speculation. *See* Bivona Aff. ¶ 13 ("I know that about 80% of B&C's accounts

receivable as of November 2011 were collectable because the vast majority of them were owed to

B&C by clients I brought to B&C during my ownership of the firm. I have maintained contact

with many of the decision makers at these clients and I believe I could have obtained payment

from them."); Schwed Decl. Ex 9 at 91 ("It's hard for me to tell you how much [I could have

collected]. I don't really know, but I think it could have been significant."). Such self-serving

speculation is insufficient to create a genuine dispute for trial. *See Robinson v. Concentra Health

Servs.*, Inc., 781 F.3d 42, 44 (2d Cir. 2015) (non-movant "must do more than simply show that

there is some metaphysical doubt as to the material facts, and may not rely on conclusory

allegations or unsubstantiated speculation") (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358

(2d Cir. 2011)).

  Bivona's commercial reasonableness defense thus fails as a matter of law.[15] In addition,

because Bivona's fifth counterclaim for breach of the covenant of good faith and fair dealing

---

[15] It is worth noting, however, that even if Bivona succeeded on this defense at trial, it would not absolve him
from liability; rather, the defense is relevant only to the amount of damages available to Wells Fargo. *See Overseas*

wholly relies on his claim that the disposition of Bivona & Cohen's assets was commercially
unreasonable, it must also be dismissed.

### M. Aiding and Abetting a Breach of Fiduciary Duty

In his fourth counterclaim, Bivona alleges Wells Fargo aided, abetted and induced
Monteleone's breach of fiduciary duties to Bivona. Bivona asserts that Monteleone, as sole
shareholder of Bivona & Cohen, owed a fiduciary obligation to Bivona as a former shareholder
and that this obligation was breached when Monteleone "conspired with [Wells Fargo] to loot
[Bivona & Cohen] and dispose of its collateral in a commercially unreasonable manner," and that
Wells Fargo knowingly induced the breach. Am. Answer ¶¶ 73–74.

In order to establish participation in a breach of fiduciary duty under New York law, Bivona
must establish the breach of a fiduciary duty owed to him, Wells Fargo's knowing participation in
the breach, and damages. *SCS Comm., Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004)
(citation omitted). Bivona has not established these elements here. Even assuming that
Monteleone and Bivona & Cohen breached fiduciary duties owed to Bivona—a conclusion for
which there is no evidence—Bivona has failed to "adduce[] evidence sufficient to allow a trier-of-
fact to reasonably infer that [Wells Fargo] had 'actual knowledge' of [those] breaches . . . as
required by New York law." *Briarpatch Ltd. LP v. Phoenix Pictures, Inc.*, 312 F. App'x 433, 434
(2d Cir. 2009) (citing *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005)). Although Bivona
asserts that Wells Fargo knew that Bivona & Cohen had "certain contractual and common law

---

*Private Inv. Corp. v. Furman*, No. 10-CV-7096 (RJS), 2012 WL 967458, at *10 (S.D.N.Y. Mar. 14, 2012) ("New
York courts have found that this issue 'is relevant [only] to the amount of damages . . . not to [defendants' liability].'")
(quoting *Citicorp Leasing, Inc. v. United Am. Funding, Inc.*, No. 03-CV-1586 (WHP), 2005 WL 1847300, at *8
(S.D.N.Y. Aug. 5, 2005)); *Gen. Trading Co. v. A & D Food Corp.*, 738 N.Y.S.2d 845, 846 (App. Div. 1st Dep't 2002)
("[w]hether defendants are liable upon their guarantee is an issue which may be resolved apart from and in advance
of any determination as to whether the sale of the collateral was conducted in [a] commercially reasonable fashion,
the latter being relevant in the present litigation only to the determination of damages.").

obligations" to him, Am. Answer ¶ 74, the record contains no evidence that Wells Fargo was aware of any specific obligations or of a breach of such duties by the firm. As there is no basis to conclude that Wells Fargo "knowingly induced" a breach, Bivona's fourth counterclaim is dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted in its entirety, resolving Wells Fargo's claims against Defendant Bivona in favor of Wells Fargo and dismissing Bivona's counterclaims. The Clerk of the Court is respectfully directed to close item 68 on the docket. This matter will be referred for an inquest on the appropriate amount of damages with interest, and the requested award of attorney's fees.

Remaining to be decided are Bivona's cross-claims against Defendant Bivona & Cohen P.C. for indemnity and contribution.[16] To the extent that Bivona seeks a default judgment on such claims, he must request a certificate of default from the Clerk of the Court, and comply with the procedures set forth in Rule 4(F) of the Court's Individual Rules and Practices in Civil Cases.

SO ORDERED.

Dated:  September 30, 2015
        New York, New York

Ronnie Abrams
United States District Judge

---

[16] Under New York law, a guarantor is "equitably entitled to full indemnity against the consequences of a principal obligor's default." *Brangan v. Omnicorp Ltd.*, No. 93-CV-7239 (DLC), 1995 WL 366301, at *9 (S.D.N.Y. June 20, 1995) (*Leghorn v. Ross*, 384 N.Y.S.2d 830, 831 (App. Div. 1st Dep't 1976), aff'd on other grounds, 399 N.Y.S.2d 206 (1977)).