UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

WELLS FARGO BANK, N.A.,                          :

            Plaintiff,                          :

    -v.-                                                 REPORT & RECOMMENDATION

                        :      12 Civ. 5212 (RA) (GWG)

BIVONA & COHEN, P.C. et al.,

                        :

            Defendants.
------------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

       Wells Fargo Bank, N.A., ("Wells Fargo") brought this action against Bivona & Cohen

("B&C") and John Bivona seeking to enforce obligations under two loans to B&C and Bivona's

guaranties of these obligations.  The district court found Bivona liable under his guaranties

following Wells Fargo's previous motion for summary judgment.  Wells Fargo now seeks

summary judgment on the issue of damages.[1]  For the reasons stated below, its motion should be

granted.

---

     [1] See Notice of Motion, filed January 21, 2016 (Docket # 103); Statement Pursuant to
Rule 56.1 of the Civil Rules of the Southern District of New York, filed January 21, 2016
(Docket # 104) ("P56.1"); Declaration of Sara Ottman, filed January 21, 2016 (Docket # 105)
("Ottman Decl."); Declaration of Nathan Schwed, filed January 21, 2016 (Docket # 106)
("Schwed Decl."); Memorandum of Law in Support of Wells Fargo Bank N.A.'s Motion for
Summary Judgment for Damages and Attorneys [sic] Fees, filed January 21, 2016 (Docket #
107) ("Pl. Mem."); Certificate of Service, filed January 22, 2016 (Docket # 108); Defendant
John Bivona's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment
for Damages and Attorneys' Fees, filed February 8, 2016 (Docket # 109) ("Def. Mem.");
Affidavit [sic] of Jesse Strauss in Opposition to Plaintiff's Motion for Summary Judgment on
Damages, filed February 8, 2016 (Docket #110) ("Strauss Aff."); Defendant John v. Bivona's
Counterstatement of Material Facts in Opposition to Plaintiff's Rule 56.1 Statement, filed
February 8, 2016 (Docket # 111) ("D56.1"); Reply Memorandum of Law in Further Support of
Wells Fargo Bank N.A.'s Motion for Summary Judgment For Damages and Attorney Fees, filed
February 18, 2016 (Docket # 112) ("Pl. Reply"); Declaration of Nathan Schwed, filed March 25,
2016 (Docket # 116) ("Supp. Schwed Decl.").

I.      BACKGROUND

As described more fully in the opinion granting Wells Fargo summary judgment on liability against Bivona, Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C., 2015 WL 5752595 (S.D.N.Y. Sept. 30, 2015), predecessors of Wells Fargo extended various amounts of credit to B&C beginning in the 1990's.  P.56.1 ¶ 2; D56.1 ¶ 2.  During this period, Bivona and other members of B&C signed guaranties associated with these loans.  Id.  In December 2010, Wells Fargo extended two loans to B&C totaling $1,900,000.  P56.1 ¶ 3; D56.1 ¶ 3.[2]  In connection with these loans, B&C signed two promissory notes: one for advances up to $1,350,000, and the other for advances up to $550,000.  P56.1 ¶ 3; see also Promissory Note for $1,350,000, dated December 14, 2010 (annexed as Ex. A to Ottman Decl.) ("First Note"); Promissory Note for $550,000, dated December 14, 2010 (annexed as Ex. B to Ottman Decl.) ("Second Note") (collectively the "Notes").  At the same time, both Bivona and a B&C partner, Marlene Monteleone, signed personal guaranties for each obligation.  P56.1 ¶ 4; Ottman Decl. ¶ 10; see also Unconditional Guaranty regarding $1,350,000 Promissory Note, dated December 14, 2010 (annexed as Ex. C to Ottman Decl.) ("First Guaranty"); Unconditional Guaranty regarding $550,000 Promissory Note, dated December 14, 2010 (annexed as Ex. D to Ottman Decl.) ("Second Guaranty") (collectively the "Guaranties").

The two Notes had a maturity date of December 1, 2011, and provided that, in the event of a default, B&C's obligations to Wells Fargo would accrue interest at the rates specified in the

---

[2]  In paragraph 3, as well as in other paragraphs of Bivona's 56.1 counterstatement, Bivona purports to controvert a statement in Wells Fargo's Rule 56.1 statement but, in fact, provides facts irrelevant to the paragraph being disputed.  See D56.1 ¶ 3.  In such instances we deem Wells Fargo's statement admitted because Bivona has failed to "specifically controvert[]" Wells Fargo's statements as required by Local Civil Rule 56.1(c).

Notes plus 3%.  P56.1 ¶ 5; see also the Notes.  Both the Notes and the Guaranties also included provisions requiring the borrower and guarantor to pay Wells Fargo's reasonable expenses incurred in the enforcement or collection of the obligations, including reasonable attorneys' fees. P56.1 ¶ 6; First Note at 3; Second Note at 3; First Guaranty at 4; Second Guaranty at 4.  The extent of the guarantors' liability differed under the two Guaranties.  The guarantors' liability under the First Guaranty was capped at $675,000.  P56.1 ¶ 8; First Guaranty at 1.  Liability under the Second Guaranty, however, was unlimited.  P56.1 ¶ 10; Second Guaranty at 1.

On February 27, 2012, Wells Fargo informed B&C and both guarantors that the loans had matured and that B&C was in default.  See Ottman Decl. ¶ 11.  The following month, Monteleone began to deliver checks to Wells Fargo that were directly processed and applied to B&C's debt.  Ottman Decl. ¶ 13.  In April 2012, Wells Fargo entered into a Forbearance Agreement with B&C and Monteleone, under which "Monteleone agreed to collect [B&C's] accounts receivable and deliver checks received from [B&C's] clients to Wells Fargo[] in exchange for Wells Fargo['s] agreement to release Monteleone [from the Guaranties] if she collected and delivered . . . at least $700,000."  Ottman Decl. ¶ 12; see also Agreement, dated April 2, 2012 (annexed as Ex. E to Ottman Decl.) ("Forbearance Agreement").  After the implementation of the Forbearance Agreement, Monteleone began depositing checks into B&C's account with Wells Fargo, which is referred to as the "Collection Account."  See Ottman Decl. ¶ 13.  Once these checks cleared, the funds were directly applied toward B&C's debt, starting with the First Note.  Id.  Wells Fargo contends that between March 2012 and December 2012, it received checks from Monteleone in the aggregate sum of $735,120.35.[3]  See Ottman Decl. ¶¶

---

[3]  As addressed below, Bivona disputes the amount of money Wells Fargo actually received.  Def. Mem. at 16.

14-15.  As proof of these deposits, Wells Fargo has produced a ledger, see id.; Bivona & Cohen

P.C. Ledger (annexed as Ex. F to Ottman Decl.) (the "Ledger"), listing the checks it received

directly from Monteleone, as well as those deposited into the Collection Account.  The amount

Wells Fargo recorded as being received on the Ledger, however, was later reduced by certain

amounts.  Specifically, three checks totaling $2,941.48, dated April 16, 2012, April 17, 2012,

and April 20, 2012, on the Ledger  "were mistakenly listed twice," and thus deducted from the

total amount received.  Ottman Decl. ¶ 15.  One check in the amount of $4,638.13, dated March

16, 2012, failed to clear after it had been received and applied to B&C's debt.  Id. ¶ 16; Check

and Loan History, dated April 12, 2013 (annexed as Ex. G to Ottman Decl.).  Further reductions

occurred when (1) Wells Fargo returned $12,638.05 to B&C, which represented "client

payments that were to pay for disbursements, in accordance with paragraph 3 of the Forbearance

Agreement," Ottman Decl. ¶ 17; Letters and Checks (annexed as Ex. H to Ottman Decl.), and (2)

Wells Fargo deducted the value of three checks totaling $3,151.67, which had also been

designated to pay for disbursements B&C had incurred on behalf of its clients.[4]  Ottman Decl.

¶ 18; Checks (annexed as Ex. I to Ottman Decl.).  After applying these reductions, Wells Fargo

calculated that it received a total of $711,751.02 in funds applicable toward the note obligations.

Ottman Decl. ¶ 19.[5]

In December 2013, Wells Fargo determined that "it [had] bec[ome] clear that no further

---

[4]  The cashier's check submitted to B&C as repayment of the $3,151.67, was only for
$3,140.33.  See Ottman Decl. ¶ 18; id. n.1. The extra $11.34 remains in the Collection Account.
Id.

[5]  This amount consist of $735,120.35 minus $2,941.48 in duplicate checks, minus
$15,778.38 in returned disbursement payments, minus $11.34 in funds that remained in the
collection account, and minus the $4,638.13 value of the invalid check.

checks were being received," and decided to close the Collection Account used to collect funds from B&C and apply such funds toward B&C's note obligations.  Ottman Decl. ¶ 22.  At this point, Wells Fargo had applied the $711,751.02 received toward B&C's First Note ($6,209.28 was applied toward interest and $705,542.44 was applied toward the principal), reducing the principal of the First Note to $644,457.56.  Id. ¶ 20.  The principal on the Second Note remained at $450,000.  Id.

II.     LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(a) provides that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (citation omitted); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence.")

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the non-moving party.  Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256, and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation

5

omitted).  Where "the nonmoving party bears the burden of proof at trial, summary judgment is

warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an

element essential to [its] case.'"  Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (alteration in

original) (quoting Celotex, 477 U.S. at 322).  Thus, "[a] defendant moving for summary

judgment must prevail if the plaintiff fails to come forward with enough evidence to create a

genuine factual issue to be tried with respect to an element essential to its case."  Allen v.

Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

III.     DISCUSSION

    A.     Damages

Bivona argues that material issues of fact remain that should preclude summary judgment

on damages.  Bivona's arguments relate to: (1) the amount of accounts receivable Monteleone

actually collected from B&C's clients; (2) the "payments that Wells Fargo admits it received

from B&C"; and (3) the amount of money that was credited toward the two Notes.  See Def.

Mem. at 14.  We address each area in turn.

    1.     The Amount of Accounts Receivable Collected by Monteleone

Bivona contends that there are material issues of fact "with respect to the [a]mount of

[a]ccounts [r]eceivable that Ms. Monteleone [c]ollected from B&C's [c]lients."  Def. Mem. at

14.  He argues that because in his view some of the accounts receivable are unaccounted for, he

should not be held liable given that he "cannot exerciser [sic] his subrogation [rights] over

amounts B&C's clients already paid but that are unaccounted for by Wells Fargo."  Def. Mem. at

15.

It appears that Bivona is arguing that there is a dispute of fact regarding whether

Monteleone received more money from B&C's clients than she actually remitted to Wells Fargo

in order to pay off the Notes.  This argument is rejected.  In support of his argument,  Bivona

cites merely to three reports that estimate B&C's total accounts receivable in various amounts

greater than the $711,751.02 Wells Fargo states it has collected.  Def. Mem. at 14 (citing Becker

Meisel Report, dated February 21, 2012 (annexed as Ex. E to Strauss Aff.); Nathan Hale Email,

dated February 8, 2012 (annexed as Ex. C to Strauss Aff.); Bivona & Cohen, P.C. Aged

Accounts Receivable Report, dated February 9, 2012 (annexed as Ex. K to Strauss Aff.)).  These

three reports, however, would not allow a reasonable jury to conclude that Monteleone collected

more than $711,751.02.  As Bivona describes, the three reports merely purport to "estimate[]"

the total accounts receivable.  Def. Mem. at 14.  They do not address the amount of funds

Monteleone acquired.  Thus Bivona has not created a material issue of fact on this question.[6]

### 2. Amount of Payments Received by Wells Fargo

Bivona contends that issues of fact remain with regard to "the [a]mount of [p]ayments

that Wells Fargo [r]eceived from [Bivona & Cohen]."  Def. Mem. at 16.  His argument on this

point, however, relates to the "actual amounts" of accounts receivable "collected by [Bivona and

Cohen]" and whether the documents submitted make clear how much Bivona and Cohen

collected.  Def. Mem. at 16.  These arguments are irrelevant.  That the B&C documents do not

make clear how much B&C collected does not provide any evidence regarding how much Wells

Fargo received.  An officer of Wells Fargo with personal knowledge of the collection has

provided a Ledger, which lists the checks that were either provided directly by Monteleone or

were deposited into the Collection Account.  Ottman Decl. ¶¶ 13-15, 19; see also Ledger.

---

[6]  Bivona cites Port Distrib. Corp. v. Pflaumer, 880 F. Supp. 204 (S.D.N.Y. 1995), for the
proposition that summary judgment is not possible "until Wells Fargo can account for the
missing accounts receivable."  Def. Mem. at 16.  Because he has not shown there are any
"missing" accounts receivable, this argument is irrelevant.

Bivona's contention that discrepancies exist between "the amounts Ms. Monteleone . . . collected and the checks received by Wells Fargo," Def. Mem. at 16 (citations omitted), is based only on his interpretation of internal Bivona and Cohen documents, and cannot serve as evidence sufficient to create an issue of fact as to the amount of funds actually received by Wells Fargo.

### 3.     How Wells Fargo Applied Payments it Received from B&C

 Bivona argues that disputes of material fact remain as to "[h]ow Wells Fargo [a]pplied the [p]ayments [r]eceived from B&C." Def. Mem. at 17.  As we have already described, the payments credited towards the Notes did not include certain deductions Wells Fargo made from the $735,120.35 aggregate sum received, due to duplicate checks, returned disbursement payments, $11.34 that remained in the Wells Fargo collection account, and one invalid check. See Ottman Decl. ¶ 19.  Bivona attempts to discredit Wells Fargo's explanation for these deductions by describing them as "self-serving explanations," from an individual who has "never been cross-examined regarding the discrepancies." Def. Mem. at 18.  This argument does nothing to controvert the uncontradicted sworn statements from the Wells Fargo representative. Bivona has provided no admissible evidence that would allow a reasonable jury to find that the accounting provided by Wells Fargo is incorrect.

### 4.     Total Amount Owing

In light of these rulings, it is undisputed that $644,457.56 in principal is due on the First Note. See Ottman Decl. ¶ 20.  The principal due on the Second Note is $450,000. Id.

It is also undisputed that both Notes require the borrower to pay interest in addition to principal. See First Note at 1-2; Second Note at 1-2.  The interest rate on the First Note was

Wells Fargo's applicable Prime Rate, minus 0.5%.  Ottman Decl. ¶ 24; First Note at 1-2.[7]  Up

until December 16, 2015, Wells Fargo had a Prime Rate of interest of 3.25%.  Ottman Decl.

¶ 25.  On December 17, 2015, however, Wells Fargo increased this rate to 3.5%.  Id.  Thus,

interest accrued on the First Note at a rate of 2.75% up until December 16, 2015, after which it

increased to 3.0%.  Id.  The total amount of this interest was $74,354.17 as of February 18, 2016,

with $53.70 per diem interest accruing afterward.  Id.   With regard to the Second Note, interest

accrued at the Prime Rate plus 1.0%.  Ottman Decl. ¶ 26; Second Note at 1.  Thus, interest

accrued on the Second Note at a rate of 4.25%, up until December 16, 2015, after which it

increased to 4.50%.  Id. ¶ 27.  The total amount of interest due on the Second Note was

$74,153.22 as of February 18, 2016, with $56.25 per diem interest accruing thereafter.  Id.

Bivona does not dispute the interest calculations.

Accordingly, the total interest due is $148,507.39 as of February 18, 2016.  The

remaining principal balance due under the Notes is $1,094,457.56.  Thus, the total due as of

February 18, 2016, is  $1,242,964.95, with $109.95 per diem interest accruing after that date.  Id.

¶ 28.

B.    Attorneys' Fees

The Guaranties state, in relevant part, that "[Bivona] shall pay all of [Wells Fargo's] and

its affiliates' reasonable expenses incurred to enforce or collect any of the Guaranteed

Obligations, including, without limitation, reasonable . . . attorneys' . . . fees."  First Guaranty at

4; Second Guaranty at 4.  The Notes in this matter include similar provisions, which state that

---

[7]  The Notes contain a provision that permits Wells Fargo, in the event of a default, to charge an additional 3% interest rate on both Notes.  Notwithstanding B&C's default, Wells Fargo has chosen not to pursue this heightened interest rate.  Ottman Decl. ¶ 27 n.3.

"[B&C] shall pay all of Bank's reasonable expenses actually incurred to enforce or collect any of the Obligations."  First Note at 3; Second Note at 3.

Where attorneys' fees are provided for by a provision of a contract, such a provision is enforceable under New York law and courts "will order the losing party to pay whatever amounts have been expended . . . so long as those amounts are not unreasonable."  F.H. Krear & Co. v. Nineteen Named Trs., 810 F.2d 1250, 1263 (2d Cir. 1987); Ford Motor Credit Co. v. Miller, 990 F. Supp. 107, 112 (N.D.N.Y. 1998) (attorney's fees permitted under guaranty).  The "determination of the amount of attorneys' fees owed presents equitable issues of accounting which do not engage a Seventh Amendment right to a jury trial," and thus are appropriately decided by the Court.  McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1314 (2d Cir. 1993).

In determining a reasonable fee in cases involving awards under a statutory provision, "[t]he most useful starting point . . . is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," Hensley v. Eckerhart, 461 U.S. 424, 433 (1983), commonly known as the "lodestar" amount.  Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections, 522 F.3d 182, 186 (2d Cir. 2008); accord Stanczyk v. City of New York, 752 F.3d 273, 284 (2d Cir. 2014).  The same principle has been applied to awards of contractual attorney fees.  See Sidley Holding Corp. v. Ruderman, 2010 WL 963416, at *1 (S.D.N.Y. Mar. 15, 2010) ("When awarding attorney's fees pursuant to the provisions of a contract, courts evaluate the reasonableness of the fee using the lodestar method.").  This calculation yields a "presumptively reasonable fee."  Stanczyk, 752 F.3d at 284; accord Jimenez v. KLB Foods, Inc., 2015 WL 3947273, at *1 (S.D.N.Y. June 29, 2015).  Although district courts may modify this award to ensure that it represents a reasonable fee and incorporates important or unique aspects of a case, see, e.g., Clarke v. Frank, 960 F.2d 1146,

10

1153 (2d Cir. 1992); Rodriguez ex rel. Kelly v. McLoughlin, 84 F. Supp. 2d 417, 421 (S.D.N.Y.

1999), the lodestar figure "includes most, if not all, of the relevant factors constituting a

reasonable attorney's fee." Perdue v. Kenny ex rel. Winn, 559 U.S. 542, 543 (2010) (citation

and internal quotation marks omitted).

Wells Fargo has requested $346,358.04, consisting of $324,488.78 in fees up to

November 30, 2015, $11,263.28 in fees for the month of December 2015, and $10,605.98 in

costs and disbursements. See Schwed Decl. ¶ 37; Supp. Schwed Decl. ¶¶ 3-4. The attorneys'

fee request represents a claimed 1,076 hours expended toward "enforc[ing] or collect[ing] any of

the Guaranteed Obligations" in this matter. First Guaranty at 4; Supp. Schwed Decl. ¶¶ 2-4; see

also ZEK's Negotiated Rates and Total Hours Billed by Fee Earner, filed March 25, 2016

(annexed as Ex. 15 to Supp. Schwed Decl.) ("ZEK Chart"). Wells Fargo is not seeking

reimbursement for any work completed by its lawyers, Zeichner Ellman & Krause LLP

("ZEK"), during 2016. Supp. Schwed Decl. ¶ 5.

At one point, ZEK voluntarily reduced its bill to Wells Fargo by $22,153.82, by

eliminating certain time entries that it deemed non-reimbursable or reimbursable at a lower rate.

See Supp. Schwed Decl. ¶ 3. Thus, we will reduce any fee award by $22,153.82.

In opposing summary judgment on attorneys' fees, Bivona makes arguments against the

availability of fees generally as well as the reasonableness of Wells Fargo's requested award.

See Def. Mem. at 18-22. We address these arguments next.

    1.   Coverage

Bivona argues that:

[t]he Guaranties are not broad enough to permit the recovery of fees and expenses related
to Wells Fargo's negotiations with Ms. Monteleone, drafting the April 2, 2012
[Forbearance] Agreement, research regarding Ms. Monteleone's ability to pay on her

personal guaranty and its Wells Fargo [sic] and ZEKs [sic] efforts to enforce the terms of the April 2, 2012 Agreement, including its retrieval of checks at the post office."

Def. Mem. at 18-19; see also Forbearance Agreement.  Wells Fargo contends, however, that the Guaranty language stating "[Bivona] shall pay all of [Wells Fargo's] and its affiliates' reasonable expenses incurred to enforce or collect any of the Guaranteed Obligations," First Guaranty at 4; Second Guaranty at 4, necessarily includes such activities because they were taken in an effort to enforce or collect on the obligations themselves.  We agree.

As noted by Wells Fargo, the language of the Guaranties does not limit recovery of legal expenses to efforts taken to enforce or collect on the Guaranties themselves.  Rather, it includes all reasonable expenses to "enforce or collect any of the Guaranteed Obligations" under the Notes.  First Guarantee at 1; Second Guarantee at 1.  The activities for which Bivona disputes coverage are part of the efforts to "enforce or collect" on the note obligations inasmuch as they were undertaken in an effort to collect on assets that were applied toward those obligations. Indeed, these efforts ultimately resulted in the collection of over $700,000 in assets, which reduced Bivona's current liability.  To the extent Bivona is arguing that the procedures used by Wells Fargo to "enforce or collect" on the loans were unreasonable — for example, its reliance on Monteleone and the development of her Forbearance Agreement — this Court has already found these methods to be reasonable.  Wells Fargo Bank, N.A., 2015 WL 5752595, at *15 ("Wells Fargo reasonably relied on Bivona & Cohen, through Monteleone, to collect its own accounts receivable.").  In its decision, the Court specifically approved of Wells Fargo's decision to rely on Monteleone, provide her with a forbearance agreement as motivation, and ultimately close the collection accounts after reaching the determination that further accounts receivable were essentially uncollectible.  Id. at *14-15.

New York courts have held that where a guarantee agreement uses "broad language" to require the guarantor to pay, for example, "all sums due" under the terms of a promissory note, "the guarantor is liable, upon the obligor's default, to the same extent as the obligor." Desiderio v. Devani, 24 A.D.3d 495, 497 (2nd Dep't 2005) (citing Anderson Credit & Leasing Corp. v. McEvoy, 236 A.D.2d 569, 569 (2nd Dep't 1997)) (additional citations omitted); accord Raven El. Corp. v. Finkelstein, 223 A.D.2d 378, 378 (1st Dep't 1996) (noting that a guaranty agreement is a "separate undertaking" that may result in "liability of the guarantor [that] may be broader than and exceed the scope of that of the principal."); Sachs v. Adeli, 2013 N.Y. Misc. LEXIS 2432, at *1 (N.Y. Sup. Ct. 2013). Here, the Guaranties broadly required Bivona to guarantee "the timely payment and performance of all liabilities and obligations of Borrower to Bank." First Guarantee at 1; Second Guarantee at 1. Thus, Wells Fargo may seek its legal expenses for collecting on — or working with Monteleone to collect on — B&C's accounts receivable.

### 2.    Reasonable Hours

To support the attorney fee request, plaintiff's counsel has submitted a summary of contemporaneous time records in the form of monthly invoices for the period of January 2012 until December 2015. See Zeichner Ellman & Krause LLP Invoices (annexed as Ex. 9 to Schwed Decl.) ("ZEK Invoices"); Zeichner Ellman & Krause LLP Invoice, dated December 31, 2015 (annexed as Ex. 16 to Supp. Schwed Decl.) ("ZEK December 2015 Invoice"). The invoices describe the type of work performed, the name of the person who performed this work, the amount of time spent, and the date on which the work occurred. Id. In its review of time records, a court's task is to make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994). The critical inquiry is "whether, at the time

the work was performed, a reasonable attorney would have engaged in similar time expenditures." Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992) (citation omitted), cert. denied, 506 U.S. 1053 (1993); accord Angamarca v. Pita Grill 7 Inc., 2012 WL 3578781, at *12 (S.D.N.Y. Aug. 2, 2012).

If a court finds that claimed hours are "excessive, redundant, or otherwise unnecessary," it should exclude those hours from its calculation. Hensley, 461 U.S. at 434; accord Quaratino v. Tiffany & Co., 166 F.3d 422, 426 n.6 (2d Cir. 1999) (citations omitted); Farmer v. Hyde Your Eyes Optical, Inc., 2015 WL 2250592, at *15 (S.D.N.Y. May 13, 2015). However, as the Supreme Court noted in Hensley, "[t]here is no precise rule or formula for making these determinations." 461 U.S. at 436. Because "it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application," New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983), "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application,'" Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (quoting Carey, 711 F.2d at 1146). Thus, a district court is not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items." Lunday, 42 F.3d at 134.

With regard to the reasonableness of the hours spent litigating this matter, Bivona argues that ZEK's claim should be reduced based on vague invoice entries, time billed for travel expenses, and an inefficient assignment of work. Def. Mem. at 19-23.[8]

---

[8] We note that Bivona has not disputed the reasonableness of the hours or hourly rates requested by Wells Fargo for the work performed by ZEK during December 2015. Indeed, Bivona did not file any opposition to the supplemental briefing on this issue as requested by the Court. See Order, filed March 11, 2016 (Docket # 114); Supp. Schwed Decl.

As to the claim of vagueness, "[d]eficient or incomplete billing records may result in a reduced fee award," Union Cent. Life Ins. Co. v. Berger, 2013 WL 6571079, at *7 (S.D.N.Y. Dec. 13, 2013) (citing Hensley, 461 U.S. at 437 n.12).  To allow a court to perform its reasonableness review, billing records "need not be extraordinarily detailed, [but] they must identify the general subject matter of the claimed time expenditures." Osterweil v. Bartlett, 92 F. Supp. 3d 14, 30 (N.D.N.Y. 2015) (quotation omitted) (citing Hensley, 461 U.S. at 437 n.12). Without citing to any specific examples, Bivona argues that many of the time entries are "impermissibly vague and should not be accepted without an inquest."  Def. Mem. at 19.  The Court has reviewed the unredacted version of the ZEK invoices (Docket # 113), and concludes that in most instances they sufficiently identify the subject matter of the expenditures.  While they may not always provide detail as to the particular task being performed, when viewed in "the context of other work performed around the same time," they provide a sufficiently detailed picture to enable our review.  See Rozell v. Ross-Holst, 576 F. Supp. 2d 527, 540 (S.D.N.Y. 2008); accord Berger, 2013 WL 6571079, at *7 (citing cases holding that a fairly general description may be sufficient, when viewed in context, to permit a court's review).  Nonetheless, there are a significant number of entries that refer simply to a "telephone conference" or "correspondence" with an individual without any other description.  Because such entries hinder the Court's assessment of the reasonableness of these time expenditures, we will reduce the hours sought by 10%.  See, e.g., United States Football League v. National Football League, 887 F.2d 408, 415 (2d Cir. 1989) (approving 10% reduction of total fee award to account for vagueness in documentation of certain time entries); see also Carter v. Wolf, 2013 WL 1946827, at *4 (D. Conn. May 9, 2013) (15% reduction where entries were merely "review of file," "review of correspondence," and "preparation of brief."); Kirsch, 148 F.3d at 172-73 (upholding

15

20% reduction in billed time for vagueness and other deficiencies where many time entries

merely read "letter to court," "staff conference," and "work on motion").

Bivona further argues that Wells Fargo has improperly sought fees for a paralegal's time

"traveling to and from the post office and conferencing with Ms. Monteleone at the post office."

Def. Mem. at 20.  Courts in this district "generally do not credit travel time at [an] attorney's full

hourly rate and customarily reduce the amount awarded for travel to at least 50% of that rate."

Daiwa Special Asset Corp. v. Desnick, 2002 WL 31767817, at *4 (S.D.N.Y. Dec. 3, 2002);

Wilder v. Bernstein, 975 F. Supp. 276, 283-84 (S.D.N.Y. 1997) (citing cases).  Courts have also

applied similar reductions to fees requested for paralegal travel.  See, e.g., Boston v. Brown,

1996 WL 221561, at *6 (N.D.N.Y. April 23, 1996).  Bivona fails to specify which billing entries

reflect such practices, however, and thus we would be justified in ignoring this challenge.

Nonetheless, we have undertaken the effort to find them and have located two entries referring to

"travel," which total 3.2 hours.  See ZEK Invoices: Bill #: 192779 on March 1, 2012,  and March

29, 2012.  Accordingly, we will grant 50% of the regular hourly rate that we award for 3.2 hours

billed by paralegals during the 2012 year.

Finally, Bivona argues that the requested fee award is inflated due to an overuse of

ZEK's senior partners for assignments more suitable and "more efficiently . . . accomplished by

more junior attorneys."  Def. Mem. at 21.  Bivona does not, however, cite to a single entry that

he maintains reflects this practice.  Instead, he states broadly that "reviewing discovery

documents and communicating with opposing counsel regarding discovery issues could have

easily been done by an associate with a much lower billing rate."  Id.  The Court disagrees that

such tasks should necessarily be handled by a junior attorney.  Discovery is the lifeblood of

litigation and can often proceed more efficiently when an experienced attorney is involved.

Notwithstanding the vagueness of Bivona's challenges, the Court has also considered the total number of hours devoted to this matter.  The invoices reflect that, over the course of more than four years, ZEK attorneys and staff have spent 1,076 hours in their efforts to enforce or collect on the Guaranties.  ZEK Chart; ZEK December 2015 Invoice.  The significant number of hours expended in this matter resulted from both extensive negotiations regarding the collection of B&C's accounts receivable, as well as the litigation regarding liability and damages.  The negotiations resulted, of course, in a significant reduction of Bivona's liability under the Guaranties.

With regard to the time spent actually litigating this matter, the parties engaged in substantial and prolonged discovery and, as of December 2015, had briefed two summary judgment motions.  As noted by Wells Fargo, a significant amount of time was spent after Bivona amended his answer to include a forgery defense, which resulted in the court denying Wells Fargo's initial summary judgment motion and further discovery.  See Schwed Decl. ¶¶ 6, 16-18; Defendant John Bivona's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of His Cross Motion to Amend the Answer, filed June 8, 2013 (Docket # 30), at 15-16; Order, filed January 22, 2014 (Docket # 48).  While the defense was withdrawn by Bivona more than a year after the initial motion was filed, its inclusion prolonged the litigation.  In light of these facts, we find the number of hours spent in this case — particularly with the 10% reduction — to be reasonable.  Many of the hours sought consist of time spent consulting and negotiating with Monteleone, B&C, and Wells Fargo representatives to recover funds that ultimately lowered the degree of liability Bivona now faces under the Guaranties.  Furthermore, the prolonged litigation, necessitating a significant investment of time and effort on ZEK's part, was due largely to Bivona's own efforts to frustrate Wells Fargo's

17

prosecution of the matter, including the use of the ultimately withdrawn forgery defense and the assertion of 14 affirmative defenses and 6 counterclaims that were ultimately found to be meritless.  See Schwed Decl. ¶¶ 6, 16-18; Wells Fargo Bank, N.A., 2015 WL 575259, at *4-*16.

### 3.    Reasonable Hourly Rate

Arbor Hill made clear that a "reasonable" hourly rate is "what a reasonable, paying client would be willing to pay."  522 F.3d at 184; accord Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr., 652 F.3d 277, 289 (2d Cir. 2011).  Thus, "the district court (unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively."  Arbor Hill, 522 F.3d at 184 (emphasis added).  The rate to be set for attorneys must be "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)); accord Reiter v. MTA N.Y.C. Transit Auth., 457 F.3d 224, 232 (2d Cir. 2006).

To determine an appropriate hourly rate, Arbor Hill directs that a court should engage in the following process:

> [T]he district court, in exercising its considerable discretion, [is] to bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate.  The reasonable hourly rate is the rate a paying client would be willing to pay.  In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively.  The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.  The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

522 F.3d at 190 (emphasis in original).[9]  Arbor Hill specifically identified the following factors

to be considered in determining what a reasonable, paying client would be willing to pay:

> the complexity and difficulty of the case, the available expertise and capacity of
> the client's other counsel (if any), the resources required to prosecute the case
> effectively (taking account of the resources being marshaled on the other side but
> not endorsing scorched earth tactics), the timing demands of the case, whether an
> attorney might have an interest (independent of that of his client) in achieving the
> ends of the litigation or might initiate the representation himself, whether an
> attorney might have initially acted pro bono (such that a client might be aware
> that the attorney expected low or non-existent remuneration), and other returns
> (such as reputation, etc.) that an attorney might expect from the representation.

Id. at 184.

The fee applicant bears the burden of establishing the reasonableness of the hourly rates

requested.  Blum, 465 U.S. at 895 n.11.  The applicant must produce satisfactory evidence that

the requested rates are in line with those prevailing in the community.  Id.; accord Bravia Capital

Partners, Inc. v. Fike, 296 F.R.D. 136, 143 (S.D.N.Y. 2013).

In considering the appropriate rates, this Court will also rely on its own knowledge of the

rates charged by practitioners.  See McDonald ex rel. Prendergast v. Pension Plan of the

NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96-97 (2d Cir. 2006) ("A district court may also

---

[9]  The "Johnson factors" are those laid out in the case of Johnson v. Ga. Highway
Express, Inc., 488 F.2d 714 (5th Cir. 1974).  These are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3)
> the level of skill required to perform the legal service properly; (4) the preclusion
> of employment by the attorney due to acceptance of the case; (5) the attorney's
> customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time
> limitations imposed by the client or the circumstances; (8) the amount involved in
> the case and the results obtained; (9) the experience, reputation, and ability of the
> attorneys; (10) the "undesirability" of the case; (11) the nature and length of the
> professional relationship with the client; and (12) awards in similar cases.

Arbor Hill, 522 F.3d at 186 n.3 (citing Johnson, 488 F.2d at 717-19).

use its knowledge of the relevant market when determining the reasonable hourly rate.") (citing Miele v. N.Y. State Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987)); Farbotko v. Clinton Cty., 433 F.3d 204, 209 (2d Cir. 2005) (court may consider its "own familiarity with the rates prevailing in the district") (citation omitted).  This Court's knowledge derives largely from the Court's participation in settlement conferences, in which the Court, in its private discussions, often asks attorneys to reveal their hourly rates.

Here, Wells Fargo seeks fees for attorneys at the following hourly rates: $459–$473 for Nathan Schwed, Esq.; $480–$494.50 for Stephen Ellman, Esq.; and $223–$230 for David Hamilton, Esq.[10]  See ZEK Chart; ZEK December 2015 Invoice.  Wells Fargo has also submitted statements attesting to the experience of these attorneys.  See Schwed Decl. ¶¶ 40-46; ZEK December 2015 Invoice; see also Nathan Schwed Background (annexed as Ex. 10 to Schwed Decl.); Stephen F. Ellman Background (annexed as Ex. 11 to Schwed Decl.); David S. Hamilton Background (annexed as Ex. 12 to Schwed Decl.).  The Court has considered all of the factors in Johnson and Arbor Hill and notes that this case involved both the development and implementation of extensive collection efforts that have significantly reduced defendants' overall liability in this matter, as well as prolonged litigation, which demanded significant resources and skill.  Plaintiff's counsel have considerable experience in the field of commercial litigation and were able to secure an entirely favorable decision on summary judgment for their client.  Finally, the fees represent those actually paid on a regular basis by the client in this

---

[10]  While there are hours billed by other individuals, no information has been provided on their backgrounds and accordingly no fees are awarded for their hours.  See Custodio v. American Chain Link & Const., Inc., 2014 WL 116147, at *2 (S.D.N.Y. Jan. 13, 2014) (rejecting application for hours spent by attorneys where "there was insufficient information regarding their qualifications and experience.") (citing cases); Yea Kim v. 167 Nail Plaza, Inc., 2009 WL 77876, at *6 (S.D.N.Y. Jan. 12, 2009).

matter, not a hypothetical billing rate.

Keeping in mind that we must award rates based on "the least amount necessary to litigate the case effectively," Arbor Hill, 522 F.3d at 184, we approve the requested hourly rates of attorneys Schwed, Ellman, and Hamilton as within the range of appropriate rates. See, e.g., Sidley Holding Corp. v. Ruderman, 2009 WL 6047187, at *26 (S.D.N.Y. Dec. 30, 2009) ("the market rate for representation in the Southern District of New York . . . [is] in the range of $450.00 to $600.00 for experienced partners, $350.00 for senior associates, [and] $250.00 for junior associates"); accord RBFC One, LLC v. Zeeks, Inc., 2005 WL 2105541, at *2 (S.D.N.Y. Sept. 1, 2005).

With regard to the requested rates for the ZEK non-attorney staff, including the "managing clerk" and his staff, there is no suggestion that these individuals performed extraordinary tasks — for example, tasks that would normally require the skill of an attorney. Thus, we find it appropriate to award them the $75 per hour rate that we have previously found to be appropriate for paralegals. See Guaman v. J & C Top Fashion, Inc., 2016 WL 791230, at *10 (S.D.N.Y. Feb. 22, 2016) (citing cases); accord Shabazz v. City of New York, 2015 WL 7779267, at *4 (S.D.N.Y. Dec. 2, 2015); Salama v. City of New York, 2015 WL 4111873, at *3 (S.D.N.Y. July 8, 2015) ($75 is the rate "customarily awarded for paralegals" in the Southern District of New York).

### 4. Recovery of Fees from B&C as a Co-Defendant

Bivona also contends that "because B&C was a codefendant in this matter, attorneys' fees should also be assessed against it for the portion of the [sic] ZEK's work dedicated to its default." Def. Mem. at 22. Essentially, Bivona argues that he should not be responsible for "time spent addressing collecting from B&C." Id. As already discussed, Bivona's liability,

including his liability for attorneys' fees, arises out of his own Guaranty agreements in which he accepted responsibility for "all of [Wells Fargo's] and its affiliates' reasonable expenses incurred to enforce or collect any of the Guaranteed Obligations."  First Guaranty at 4; Second Guaranty at 4.  Any efforts taken by Wells Fargo to collect from B&C were necessarily part of an effort to collect on these obligations.  Thus, Bivona is liable under the Guaranties, just as B&C is liable under the Notes, for the attorneys' fees devoted toward seeking to collect from B&C.

*     *     *

The hours and rates described above produces an award of $299,174.35 as described in the following table:

| Name | 2012 | 2013 | 2014 | Through November 2015 | December 2015 | Total Award |
|---|---|---|---|---|---|---|
| Nathan Schwed | $459 X 79.50 hr | $459 X 96.40 hr | $473 X 117.50 hr | $473 X 45.90 hr | $472.76 X 10 hr | $162,753.90 |
| Stephen Ellman | $480 X 108 hr | $480 X 17.20 hr | $494 X 6.70 hr | $494 X 1.90 hr | $494.50 X .20 hr | $ 64,443.30 |
| David Hamilton | $223 X 69.10 hr | $223 X 180.40 hr | $230 X 82.50 hr | $230 X 68.10 hr | $229.75 X 21 hr | $ 95,101.25 |
| Marion Millinamow | $75 X 39.4 hr $37.5 X 3.2 hr | 0 | 0 | $75 X 10.60 hr | $75 X 8.10 hr | $4,477.50 |
| Michael Antonivich | $75 X 2.10 hr | $75X 1.20 hr | $75 X 0.70 hr | $75 X 2 hr | $75 X .40 hr | $480.00 |
| Martha Fletcher | $75 X 5.2 hr | $75 X 60.30 hr | 0 | 0 | 0 | $4,912.50 |
| Anthony Rosario | $75 X 2.10 hr | 0 | $75 X 0.70 hr | $75 X 0.50 hr | 0 | $247.50 |
| Total | | | | | | $332,415.95 |
| 10% Reduction | | | | | | ($33,241.60) |
| Grand Total | | | | | | $299,174.35 |

Taking account of ZEK's voluntary reduction, discussed above, we reduce this amount by $22,153.82 to reach a final fee award of $277,020.53.

22

C.      Costs

Wells Fargo seeks $10,605.98 in costs.  Bivona's only objections to the costs sought by Wells Fargo are that the charges for legal research "omit[] the purpose of the research," and that he should not be responsible for "long distance telephone calls," which Bivona deems "archaic in the age of cell phones and all inclusive calling plans."  Def. Mem. at 21-22.   As to whether Wells Fargo could have gotten a better rate for long distance, we note that it has sought less than $50 over the course of four years and case law does not support the argument that such costs are not compensable.  See, e.g., Staples, Inc. v. W.J.R. Assocs., 2007 WL 2572175, at *9-10 (E.D.N.Y. Sept. 4, 2007) (awarding long distance charges).  As for the legal research fees, such costs are generally awarded, so long as they "are not already accounted for in the attorney's hourly rate." Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC, 549 F. Supp. 2d 274, 286 (E.D.N.Y. 2008). Here, Wells Fargo has provided an accounting of the approximately $500 in online research costs, see ZEK Invoices, and our review of the invoices make clear that such costs were separately charged to Wells Fargo.  We see no reason why each session must be individually explained in a fee application.  Thus, the request for costs should be approved.

III.    TOTAL SUMS AWARDED

In accordance with the above, Wells Fargo should be awarded following:

| | |
|---|---|
| Amount Due Under First Note: | $ 644,457.56 |
| Amount Due Under the Second Note: | $ 450,000.00 |
| Interest: | $ 148,507.39 |
| Attorney's Fees: | $ 277,020.53 |
| Costs: | $  10,605.98 |
| TOTAL: | $1,530,591.46 |

Additionally, interest accrues at a rate of $109.95 per day from February 18, 2016, until the date of judgment.

IV.    <u>CONCLUSION</u>

Wells Fargo's motion for summary judgment (Docket # 103) should be granted.  Judgment should be awarded in favor of Wells Fargo and against Bivona in the amount of $1,530,591.46, with pre-judgment interest accruing at the rate of $109.95 per day from February 18, 2016, until the date of judgment.

<u>**PROCEDURE FOR FILING OBJECTIONS TO THIS**</u>
<u>**REPORT AND RECOMMENDATION**</u>

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Ronnie Abrams at 40 Foley Square, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Abrams.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wagner & Wagner, LLP v.</u>

Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 11, 2016
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge